We're proceeding now in the case of Horne v. WTVR. Mr. Hawkins, please. Good morning, Your Honors. May it please the Court. Richard Hawkins of the Hawkins Law Firm. I'm here this morning on this wonderful spring day on behalf of the appellant and cross appellee, Angela Ingle Horne. Your Honors, 50 years ago… If that's used to judge your credibility, you're starting out pretty bad. Well, thankfully, it's not my credibility that's at issue today. Good. Although I think we'd be fine if it was. Fifty years ago, Your Honors, and just three years after the Supreme Court entered and issued its landmark decision in New York Times v. Sullivan, then-Chief Justice Earl Warren wrote that freedom of the press under the First Amendment does not include absolute license to destroy lives or careers. The next year, 1968, Justice Abe Fortas echoed those sentiments when he wrote, albeit in a dissenting opinion, that the First Amendment is not so fragile that it requires us to immunize a reckless, destructive attack on a person's, even a public official's, reputation. He went on to say that the public official should be subject to severe scrutiny and to free and open criticism. But if he isn't… Does he stop at the proposition your client's a public official? I do not. But I recognize I might not win that. Because the law is against you, Your Honor. I don't think the law is against me, but I think there is a solid… have been called public officials. I agree. When I first looked at it, I would have said no. When you look at the law and the cases out there, there are a lot of factual patterns that fit that say your client is a public official. The law is, it's a bit scatterbrained. There are many cases that suggest that somebody in my client's position might be a public official. I take the position that she wasn't. And I take the position that she wasn't because Rosenblatt, which was the seminal case in that point, was then amplified by Gertz a few years later. And Gertz tells us that you look at the public official doctrine through the lens of the assumption of risk that a public official would make. And you look at it through the lens of does that person have access to self-help and access to media channels. So it's not a per se rule. It never has been. It's a case-by-case analysis. And it's actually a case-by-case analysis that is informed by the law of the state, which is at issue. So we don't look necessarily to the law of Texas where they hold that the CFO of a school system might be a public figure. We look to the law of Virginia. And we look to the Supreme Court of Virginia where Lipscomb, which is the controlling decision on this point, was very quick to emphasize the Gertz factors that I just focused on and very quick to say that the education context does not create a per se example of a situation where somebody employed by a public school system would automatically be a public official. But what do you do about the fact that there's an entire chapter in the Virginia Code on public school funds and that this person, your client, had the ability to manage and be responsible for $60 million of a budget? I take the position she never had that actual authority. And I want to be clear that the district court did not rule that she did. It focused on the appearance of authority. I agree. That is enough, isn't it? It would be. The apparent authority? It would be. We don't think she has that here. And to address your concern, Judge Floyd, that statute, when it talks about who controls what in terms of public funds, focuses on the superintendent of the school system. And I don't think there's any doubt that Dr. Browder here and that school superintendents all over the Commonwealth of Virginia qualify as public officials. And I think they should because when you take the top of the pyramid kind of job, you invite public scrutiny. You also, unlike Ms. Horn, have access to the media. The evidence here is overwhelming that somebody like Dr. Browder would speak directly with reporters and vice versa. If he needed to get the word out, he had direct access to television. That was never the case for Ms. Horn. And I know that she has the title of director, and this is the part that is perhaps the most troubling point for our side. Budget director. Yes, sir. Absolutely. You've had cases in which individuals in, it seems like to me, far less significant positions have been declared to be public officials. I mean, you can go back to the Rosenblatt case and other cases there, too, from the Supreme Court on it. There, I guess, the individual was like the supervisor of a county recreational area. Correct. But that person actually had authority. That person actually had the ability to control funds. And to focus on the appearance for just a minute. You don't have to actually have it. You have to appear to the public to have it. Absolutely. You could actually have someone who doesn't have it, but if the public, if you appear to them to have it. Well, I'm just wondering how, you know, we could probably go back and forth on this a lot. I'm just trying to figure out. Now, I get your point. But it seems to me the case law goes that. And, of course, if she is a public official, then, of course, the reason you don't, then you've got to go into actual malice territory, which is very difficult to go into here. But go ahead and proceed in a manner. But I guess eventually we'll have to get to that question. Well, and I'll take your question and then dovetail into actual malice. But what I wanted to say is that the appearance issue, it's case specific. So if a member of the public in Prince George County were to look at what Angela Horn actually did in the public, they would see that she was the second chair at a school board meeting. She'd be analogous to an associate and a partner sitting before this court. She wasn't the person who primarily spoke. She wasn't the person whose budget it was. The records that we put into the record that's before this court show that it was titled the superintendent's budget. So what you would have to be saying in order to hold that she's a public official is that by virtue of her title, and I think that's the only thing that is at issue here, that she would qualify as a public official. And I don't think any case has said that. I don't think that's what the Supreme Court of the United States wanted when it said that we don't look down the food chain. We have policy considerations that go beyond this. And I think if you were in Prince George County trying to figure out what she did and how she did it, you would think that she's no different than somebody else who's simply working in the school board office, very different from in degree and substance than the superintendent himself. But assuming that the law is against us and assuming that perhaps we don't win that, then we have to prove actual malice. And believe we did. We believe the district court erred in granting the Rule 50 motion against us, and we believe that the evidence of the compilation of efforts and lack of efforts that went into the creation of this news story showed that WTVR and Wayne Covill, and they are separate and the same in certain respects, knew that what they were putting out there, or had doubts, had substantial doubts, about what they were putting out there, whether or not it was true, and went forward with it anyway. And I say that because we start with the very rickety edifice upon which the story is based. It's based on a confidential source who, according to Wayne Covill, simply said, here is a person who got hired and then fired. We think this person's name is the following, and we think she works in the school board office. That was the first tip. According to Wayne Covill, it was very insignificant. Then the reporter, Mr. Covill, goes out and gets a copy of the school board application online, puts it in the news story. He then goes and interviews Dr. Browder, and he sees the hiring process, as it were. He is told that he is not going to be able to discuss specifics, but then he is told that he is going to talk about the hiring process. And there is a very strong debate as to who initiated that, and I think that discrepancy weighs in favor of finding of actual malice because both sides try to distance themselves. Both Dr. Browder and Wayne Covill try to distance themselves as the person who initiated the hiring process discussion. And then you get to the point of the criminal statute. This is where you have to discuss the facts somewhat. I think to get into it, you've got to just lay it out on the table. She goes in. She applies for this job. It seems like to me she goes out of her way to make sure. I don't know what other action is going on here, but it sounds like to me there should be something else other than this going on, but we don't need to deal with that in this case. You do not, but yes, you're right. So then the superintendent or whoever basically assures her that this conviction she has is not going to keep her from having this job. Then within a year they come back and say, oh, no, you can't have this position because you have this conviction. And of course she's then fired or released. And then the newspaper reporter, and this is where his malice is, where you talk about it, comes in. He goes in and tries to talk to the superintendent. The superintendent says, I can't tell you the specifics. I can only tell you general stuff. And that is that, yes, she did have, I guess everybody knows she had the conviction. We know that she was fired, but the whole business of her not disclosing it, that wasn't true. But that's what he reported because that's, I mean, that was no other from the reporter's perspective. Why would a school system hire someone if they knew from the beginning that you didn't qualify and then come back and let you go because it shows up on your record that you did? So the implication is clearly there, whether it sounds like to me that could be negligence, it could be some form of blessing, but I'm not sure it's actual malice in terms of going with it. I mean, do you know of any analogous situation where that's been found to be actual malice? Yes, sir. Well, first of all, I'll tell you why I think this is actual malice here, because I think Your Honor stopped right before the most important part of the factual development mattered for actual malice purposes. Didn't do it intentionally. I'd like to hear you go ahead and take us there. Okay. Well, it's because after they packaged up this news story, after the confidential source comes in, after they've got the application, after they've looked at the statute, and after the interview of Browder is complete, that is when he receives the anonymous email that says, I, anonymous author, provided each of the school board members with a letter that said to each of those school board members that Ms. Horn was a convicted felon. And then it raises competency questions and kind of rhetorical questions, talks about the fact that the superintendent just got a raise. But to me, when you have that email and it says you need to talk to these school board members, it tells Mr. Koval that he needed to go and find the rest of the story, as Paul Harvey would say, because there was much more to this story. And the way that Wayne Koval treated that email and the way that Cheryl Barnhouse treated that email back on February 15, 2015 shows that they subjectively believed that they had doubts about what they were reporting. And I go to the Ninth Circuit's case, which we cited on page 45 of our blue brief, which is the Eastwood v. National Inquiry case, that said you judge reporters' motives by their actions. Actions speak louder than words. Right, but in our Hatfield case, we talked about what reckless disregard of the truth was. Correct. And we said it required a subjective awareness of probable falsity. And where is there a subjective awareness of probable falsity from the evidence in this case? Let me begin by saying that nobody admitted it and nobody usually does. Right. There has to be circumstantial evidence that Koval was subjectively aware that this story was probably false under our standard. Where is that evidence in the record? That evidence is a combination of two things. It's the email, the anonymous email that comes in that raises red flags. And then it is the behavior of Mr. Koval and Cheryl Barnhouse after that email comes in. If it was as insignificant as both Ms. Barnhouse and Mr. Koval said that it was, then they should have pocket vetoed it. They should have let it go. They shouldn't have done anything. But they forwarded it. He forwarded it to his supervisors. He forwarded it to all WTVR producers. And the immediate response was not, don't worry about it, don't worry about it at all. The immediate response two minutes after getting that was, we need to pursue. And those are the key words. We need to pursue, and not just pursue, but then pursue the additional information. And Ms. Barnhouse tells Mr. Koval he needs to go dig further. And he doesn't. And I see my time is up. I'll address further. Thank you. Mr. Chimadain. Please, the Court. My name is Conrad Chimadain, and I'm here to represent WTVR. And I want to start with an overriding sort of viewpoint that may help us look at this. This is the first time in history a reporter has ever been accused of writing a dull story because he suspected he had a much more interesting and important story. If the reporter had any indication that the school superintendent of 39 years of experience did not know the law, deliberately hired a felon in violation of the law, this would have been a much more important story, and it would have been broadcast much more significantly than the story that was obtained. Well, it's pretty significant when a reporter reports that an official has lied by not disclosing something to the board, and then she gets fired, when, in fact, she didn't do that at all. She told them, I have this conviction. She didn't want to give up her other job. The way I read this, and not only after telling them, came back to the superintendent before saying, Now, are you sure the board is okay with this conviction? Then they let her on, and she worked for months. And then they come back, and I guess maybe their anonymous letter or whatever does it, an email or whatever. Then they get rid of her. And I understand that he, the reporter, that's what it looks like. I mean, it's the old duck thing. It quacks and it walks like a duck, and that's what he did. He wrote it like that. But the outcome is pretty devastating, at least from Mr. Hawkins' client's perspective. He says the email is the smoking gun in this thing. Address that email aspect. The email said they did not know what happened. The email made it plain that they wanted someone to find out what happened. No one knew at the time how she'd been hired. And the plain fact is the plaintiff concedes every word in the broadcast is true. We went and interviewed. Walk me through the premise that leads to the conclusion she lied. Because what I understand, you've got all of the premises there. She got the job. She had a conviction. They then fire her based on the conviction. And then the reporter then says, Therefore, she lied. But where is the direct evidence that says she lied other than what else could it be, I guess, theory? With all due respect, Judge Wynn, there's nothing in the story that says she lied. It is an implication. This is totally an implication. I want to make sure I understand that. When you started with all due respect, it was almost like you're going a different direction the way I went. So you mean with all due agreement, there's nothing in the story that she lied? There is nothing in the broadcast that says she lied. So he had to reach that based upon those premises that were there that I agree it looks like to me that's what she did. But does a reporter have something knowing the impact? If you write a story that says somebody lied, it seems to me you ought to ask an additional question to somebody to say maybe, did they ask her? Did they ask her, has she lied? Your Honor, he tried to reach her. Did they ask the superintendent directly, did she lie? And I know he tried to evade it. The superintendent said, I will not discuss any of the facts of the case. But did he ask the question? You know, that doesn't mean anything to a reporter that you won't discuss the facts. They'll ask you anyway, did she lie? He did not ask the question. He simply reported what the superintendent said. What did he say? The superintendent said the hiring process starts with the statute. The statute says that every applicant for a school position in the school system in Virginia must certify that they've not been convicted of a felony. The statute says no one may be hired unless they certify that. Was there a follow-up story to this? It seems like to me the follow-up story is better than this story. That is, when the superintendent says that, then he comes back and says, well, I hired her and I already knew it. And even though there was a statute, that's a good story. Was that reported? We would have followed up if we knew about it. We did not learn about this. But even now, it's a good story, isn't it? I mean, for a superintendent to go in and say we followed the statute and we only do the statute and the statute says this, and then you find out, oh, no, this lady told him not once but at least twice. I don't want this job if they're not going to take me. And he says, oh, you're going to be fine. Isn't that a good story? It would have been a good story. It would have been a much better story if we'd had any idea that occurred. I agree with that. But it seems to me it's not only a good story, it seems it might be the right thing to do if you said someone lied, to come back and clean that up and say, oh, no headlines. She did not lie. She told the truth. It was the superintendent that told the story that appears not to be correct. I think that when Ms. Horne sued, I think the first time anyone knew what the superintendent did was when Ms. Horne sued the school board. I think that was widely covered in Prince George County. She took some time to do that, didn't she? And she took some time to do it. Until that suit was filed, no one knew or could have known, respectfully, what was in the application. Ms. Horne concedes that since everything in the personnel file is confidential, the only way we could have learned that would have been if she had told us. And she never told us. She never asked for correction. She never asked for a clarification. We had no idea. And we stand by this. It is still stunning and surprising that a superintendent who we dealt with, and the record's playing on this for years, who had been one of the most forthcoming and honest superintendents we dealt with, the idea that he did not know a statute that had been in effect in Virginia for 19 years was a stunning surprise. To find we had actual malice, you would have to find there was some reason that we would have suspected that the school superintendent would not have known the law. There is no evidence that suggested that. But didn't he say he followed the statute? He said he followed. He said, I think it's very important when you review the record to read the entire interview because we broadcast the entire interview. He said the hiring process starts with the statute. He then went through the statute, went over 22.1-296.1A, where it says the applicant must certify they've not been convicted of felony. He then said it was a disqualifying factor if you knew it was a felony. It just seems to me like, you know, once you find out this, you ought to try to mitigate something. And what you just said sounds real like a great story. I'm telling you, it's more readable than the first story. What you just said right there is incredible that the superintendent would get and then he said it to it that we followed the statute. But the headline that this lady did not lie, you know, it doesn't, I know it's not required but it just seems like to me because the newspaper has that kind of influence and is out there that even if you're not liable because of the time cell and actual malice standard, it's just kind of a nice thing to do. I know it's been a while but even now it seems like to me that would be something she could frame that says, oh, no, we were wrong, she did not lie. But I guess you don't want to do that because you don't want to make any omissions appear. I'm back to full. I'm going to give you two answers. First, we did not know it and the record is playing we did not know it. I got that answer but I'm talking about when you did know it. That's what I'm talking about, when you did know. The second answer. And not knowing does not mean you didn't do anything to try to find it out either. I mean, you just took the implications and as I understand you didn't ask anybody. You just said, well, that's what it must be and he says he followed the statute and gave it a job and didn't find it, that was it. Well, I think if Ms. Horn had called at any time to say the broadcast created a false impression, we would have followed up immediately. If we first learn of something a year later. It's no longer news. Well, not only is it no longer news but I'm going to suggest to you that I have a question whether Ms. Horn would have liked to have had a follow-up story that would have emphasized her conviction and brought the whole thing up again. She filed a lawsuit. She certainly filed. You reported on this. Your Honor, I think when you think about a correction and when journalists. I suppose a story that follows from this case right here would be she didn't lie. And if you win, she didn't lie but because of the actual malice. We have never contended in this case that Ms. Horn lied. What we have said is we did not know it. What we have said is had we had any indication of it, we would have followed up. We did not try to write a story that was a duller story. Your Honor has picked up on it that the superintendent not knowing the law is much more significant but there was no basis and I still respectfully suggest this. There was no basis of any kind for anyone to suspect that the superintendent would not know the law. And the school system hires people all the time. It applies to every single person. There are no exceptions. The fact that the whole school system didn't know the law and hired her was totally stunning. It is in hindsight I would respectfully suggest stunning. At the time we did the broadcast, we had no reason to believe that the superintendent was saying anything other than being correct. It was the superintendent who said the process starts with the law. That I suggest indicates that he knows the law. It indicates that he followed the law. It was the superintendent who said we only do the background check later and we learn about it later. It was the superintendent who never suggested in any way, shape, or form that he did not know the law. This broadcast was plainly appropriately prepared. Now, we have cross-appealed on the ground that we think it is a fair report because what we did was go to the official spokesperson for the school system. We got his statement. We reported it absolutely accurately. What is the alleged defamatory statement? What is the statement that's alleged to be defamatory? It's a case where there's no The statement is that by quoting the statute, which there are two parts to the statute. The second part of the statute is a false statement is a Class I misdemeanor. When we quoted the statute, the argument is we gave an implication that Ms. Horn had made a false statement. If you review the broadcast, though, all the broadcast did was go over and say this is the statute. It was violated when a felon was hired, did not name Ms. Horn, did not identify her position, did not state the felony of which she was convicted. It said that the superintendent would not provide us any details on the specifics which he made plain. And it said the reason we're running the broadcast is so that people can know that we can avoid it in the future. The reporter's belief at the time was that they'd gotten the background check too late and they ought to do something to get this information early so they could prevent these violations of law. There was no question there was a serious violation of law. The reporter's mindset, and this is important, was someone got hired and they shouldn't have gotten hired and I'm telling the public how we can avoid it. I am dealing with a superintendent and he says this. I've dealt with him a number of times. I'm taking down exactly what he says. The evidence is plain. He had no reason to think that the superintendent was spinning it. It is regrettable, and I suggest this, that when a public official makes a mistake, they don't admit it. But if the official report privilege means anything, it means you can accurately report it. You're not responsible when a public official deliberately says something that misleads you when you accurately report it. And Ms. Horne admits that every word we state is accurate. Everything that is said was said by the superintendent. Today you're basically saying that the time cell rule here prevents this. This is not a reckless disregard. It's not a reckless disregard, yes, sir. You can say it a thousand times different ways, but that's all it is, isn't it? I don't think it's negligence, and I'm going to address that after my time's up. All right. Thank you, sir. Thank you. Thank you. Again, I want to pick up on one of the points that was emphasized by Mr. Schumann, and that was that they could never have gotten the information, the application, because it was a personnel record. Dr. Browder testified at trial that their personnel policy was, of course, subject to FOIA, and he admitted on the stand that if somebody had asked for the application, he would have then called up Ms. Horne, who would have then had the power to provide her application, and should have. They didn't do that. When he says the statute was followed, and that's all they reported, is that the statute followed, then you get the implication that she lied, that they followed the statute, because they wouldn't hire her. He didn't actually say we followed the statute. What he said is we had this hiring process. What did he say? I thought he supported that they did what they were supposed to do in terms of the statute. Right. No, what he said is this is the hiring process, and then Wayne Covell took the fact of the criminal violation and tagged it as the exclamation point to the interview. You don't actually hear Dr. Browder talk about making a miscertification on an application as being a criminal offense. That is something only the reporter did at the very end of the broadcast. That's the final coding. You know, when a superintendent says, I can't talk about it, it's typically if it's not something, if it's not favorable to her, then I can't talk about it. But if it's favorable to her, you would think he would say, oh, no, she didn't do anything wrong. He can say that. That doesn't hurt anything. But he didn't say that. He says, I can't talk about it. And the reporter, it's almost like a wink and a nod. I can't talk about it. Here's the policy. This is what we do. And he simply reports that. How is that actual malice? Well, it's actual malice because after that interview was complete, that interview was completed on Friday morning, probably before 11 o'clock. Wayne Covell testified that he went up earlier in the morning, took the interview, completed it, and was finished. Then he gets the anonymous e-mail. And I think it's important to read the text of the anonymous e-mail. And you have it before you, so I won't do it. But what I want to emphasize is that not only were each of the school board members then made aware of that fact, the e-mail very specifically says, about the superintendent, is he really doing his job? And not is he being a good superintendent, but is he doing his job in the context of this felony controversy? And I think within that context, that's your red flag. But the e-mail itself doesn't have to be a red flag. It doesn't have to say, Browder lied, Angie Horn told the truth. The inference that you are able to draw from the post-e-mail conduct about both Mr. Covell and Ms. Barnhouse shows you that they subjectively believed, and I say this, we are allowed to draw the appropriate inference with the evidence construed in our favor, that they subjectively believed that that e-mail caused problems for their story because they acted that way. They immediately said, we need to pursue. And then, and this goes to our purposeful avoidance part of our theory, is that they did nothing to find out the truth. They did no further investigation. Wayne Covell, and this is also a point in our favor, Wayne Covell testified at trial that he did respond to the anonymous e-mail. In his deposition, he told a completely different story. So when the light was shined upon him and he was under the gun, he improved his testimony. And Justice Stevens, in the Connaughton case, said that discrepancies in the testimony of defendant witnesses may have given the jury the impression that the failure to conduct a complete investigation involved a deliberate effort to avoid the truth. So you can take his dissembling as its own separate point in favor of actual malice, and you combine that with his actual actions and the actions of Cheryl Barnhouse back in 2015, not what they say now, not when they have the gun pointed at them, but back at the time. And you can see that they looked at it and they said, oh, I have to do something about this. This is significant. And then Wayne Covell says, I don't want to do anything more. Well, didn't Covell try to call Ms. Horn? He said he did, and we can't dispute that. But that doesn't suggest a real effort to find her because what we also know from the trial testimony, and this is undisputed, is that he looked up her LinkedIn profile, but he didn't e-mail her. He didn't use that information to find her. She testified that when you have a LinkedIn profile, sometimes you can see who looks at you. And she saw Wayne Covell earlier on that day, and he didn't reach out to call her. He didn't reach out to e-mail her, and he made no effort to find her. And going back to the e-mail, he made no effort to talk to any members of the school board. And I think we talk about the importance of the story, the real story, not the one that they published. If Wayne Covell had reached out and called any one of those members of the school board and said, did you know about this? Are you surprised? What happened? Then the story would have come out. Then we get to the truth. But they didn't do that, and they intentionally didn't do that, and that is the obvious inference from their failure to act, and that is exactly what happened in the Butts case. It is exactly what happened in the Connaughton case, and it is exactly what happened in the Oprah Winfrey case. It's a district court case that we cite, and we ask the court to review the evidence in those cases and compare it to what we have here. We believe that's favorable to us. I'll address the fair report privilege for just a brief second, because I think the WTBR did far more than simply quote or provide the full interview. They did provide the full interview, and then they embellished it. They have bells and whistles. They have the supers. They have the banners. They have the punchline at the end that doesn't refer to Dr. Browder. They have the statute. They did that on their own. They created the implication all by themselves, and that goes beyond what is a simple fair report privilege, such as reading an indictment or saying somebody has been charged with murder or somebody has been arrested. That's what the fair report privilege is designed to protect. It's designed to protect the accurate reporting of public actions or public documents. Virginia has never extended the fair report privilege as far as WTBR wants, but even if it did apply, it only gets us back to an issue of fact. It means that we go back to let the jury decide that, not having a ruling as a matter of law. So we believe we have created a clear and convincing inference of actual malice. We believe the Fitzgerald case shows this court how to look at evidence in favor of a plaintiff. We ask that the court reverse the decision of Judge Gibney under Rule 50, and we didn't talk about it, but we would also ask that the court reverse his denial of the motion to compel and his ruling on public officials. Thank you. May I begin by responding by noting that, as Judge Gibney pointed out in the trial, since there was a personnel exemption, since they were confidential, the reporter had been told he couldn't get any information in the personnel record, no matter who he talked to. So it wouldn't have done any good to call the school board, to call the school system or anyone else, and the superintendent made it plain that it's been their policy forever. It was their policy, and he told Mr. Coble, the only information you're going to get is what I told you. Now, in our cross-appeal, we've argued that the fair report privilege should apply here, and we think it should because what the news reporter did was he came to the official spokesperson. He came not only to an official spokesperson, but actually someone he knew, someone who had for years been totally, completely, absolutely honest. He asked him the details, and he reported exactly what the official spokesperson said. As Judge Wynn pointed out, if the official spokesperson had said anything to indicate that Ms. Horne had told them, that would have ended it. In many cases, those who deal with the media, if they know they're misleading you, will tell you, having represented the media for years, reporter, don't run with this because there's something I'm not telling you that's significant. That's why you have public information officers to help you. That didn't occur. All the superintendent said was, I can't tell you the details, but I'll go over the hiring process with you absolutely and completely. And he then said the hiring process starts with the statute. That means he knows the statute. It is a disqualifying factor if we know there's a felony. He said that. That means it stops. You don't hire a felon. There are no exceptions for hiring a felon. He says we don't learn about the conviction until later. That implies they did not know about it. He then goes over and he went down the statute in detail. The record is plain. Mr. Coble did not know about the statute. He knew they'd hired a felon. He wasn't aware of the statute. Dr. Browder told him about the statute. It was Dr. Browder who told him the two provisions in the statute. The statute really has two provisions. First, no one can be hired by a school board in Virginia without certifying that they've not been convicted of a felony. The certification requirement is on the applicant. I can't help it if that creates an inference. That's what the statute says. He then said, and by the way, if they say you've given us this already and we kind of got it in terms of your position. This doesn't meet the time selling actual malice in it. The facts are all laid out in your brief. I think we kind of got that. I'll stop. I'm not going to. I guess the point I want to make is I really feel strongly about this case and want you to think about it, that what this reporter did regret. Am I sympathetic to Ms. Horne? Yes. Do I wish we'd known about it? Darn yes. Does the station wish they'd learned about it in that time? Absolutely, unequivocally, but we didn't have any idea, and what we did is what journalists are supposed to do. The problem here, I would respectfully submit, was created by what Dr. Browder told us, and I don't think we should be responsible for that. I don't think a reporter is negligent in any way. The basic requirement for defamation is negligence. I don't think he's negligent when he reports absolutely accurately what someone he believes and has a reason to believe is telling him. For all those reasons, I would respectfully ask that your honors hold that the fair report privilege applies in this case, and I want to emphasize it's really important because, regrettably, as someone who's represented the media for a lot, you see by my age, I've been around a little bit of time, I've represented a long time, the government doesn't give you all the details. They spin it, and the best you can do is say what they say, and you shouldn't be liable if you have no reason to believe differently. Thank you, Your Honor. Thank you.
judges: Barbara Milano Keenan, James A Wynn, Jr., Henry F. Floyd